M. S. MOATS, Appellee, v. STRANGE BROS. HIDE COMPANY,
Appellant.

SALES: Postponing Delivery and Payment.  A contract of sale may
be complete, and therefore pass title, even though *delivery* and
*payment* are postponed.  Whether the title does so pass is, in
its last analysis, a question of *intent*; and in determining this
intent, the conduct of the parties may afford illuminating light.

*Appeal from Woodbury District Court.*—GEORGE JEPSON,
Judge.

JANUARY 27, 1919.

ACTION to recover a balance due on the sale of certain
wool.  Opinion states the facts.  Verdict and judgment for
the plaintiff in the court below.  Defendant appeals.—*Af-
firmed.*

*Shull, Gill, Sammis & Stilwill*, for appellant.

*Strong & Struble* and *Burke & Tamisiea*, for appellee.

GAYNOR, J.—Plaintiff brings this action to recover a
balance claimed to be due on the purchase price of certain
wool.

On or about the 16th day of October, 1916, plaintiff
had 3,000 pounds of wool in bales stored in his barn.  He
had also 270 head of sheep, from which the wool had not

been clipped. Plaintiff claims that, on said day, defend-
ant purchased all of said wool, clipped and unclipped, at
29½ cents per pound, and paid down, at the time, $25 to
apply on the purchase price. The unclipped wool was sub-
sequently clipped, and netted 1,613 pounds. It is apparent,
then, that plaintiff claims he sold to the defendant wool
totaling 4,613 pounds, at 29½ cents per pound, amounting
to $1,360.83. It is conceded that defendant has paid to
plaintiff, on the purchase price, only $604.16. The plaintiff
claims, therefore, that there is still due him $756.68, and
for this he asks judgment.

Defendant admits that plaintiff owned and had in his
possession 3,000 pounds of wool, and that the same was
stored in plaintiff's barn substantially as claimed by plain-
tiff; admits that he owned 270 head of sheep, from which
the wool, though ready for clipping, had not yet been
clipped; and says that, on said date, plaintiff offered to sell
said wool, clipped and unclipped, at 29½ cents per pound,
and that defendant agreed to purchase it at that price, and
paid $25 down; but says that the stored wool was to be
sacked by plaintiff and delivered to defendant at the rail-
way freight station at Missouri Valley, and, when so de-
livered and weighed, and the amount ascertained, the un-
clipped wool was to be clipped by plaintiff, sacked and de-
livered, and paid for the same as the stored wool; that it
was to bind this agreement that defendant paid to plain-
tiff the sum of $25; and further says that defendant has
always been ready and willing to receive the wool and to
pay plaintiff for the same, whenever delivered and received
by defendant, as contemplated in the contract; that, at
divers times, plaintiff was requested to deliver the wool,
but had neglected and failed to do so, except as hereinafter
stated; that, some time prior to the commencement of this
action, the wool in storage, while in storage in plaintiff's
barn, was partially destroyed by fire, and plaintiff was un-

able to, and never did, deliver more than 435 pounds of the same, and never did deliver to the defendant, at Missouri Valley or any other place, more than 2,048 pounds, in all, of said wool, which, at 29½ cents per pound, amounts to $604.16; that this sum defendant has paid, and there is nothing, therefore, due plaintiff.

To recapitulate, the contract, whether made as alleged by plaintiff, or as alleged by defendant, was made on the 16th day of October, 1916. The fire that partially destroyed the wool occurred on the 10th day of November, 1916. There were 435 pounds saved from the fire. Immediately after the fire, the defendant's agent came to plaintiff's farm, and directed plaintiff to haul to Missouri Valley the wool saved from the fire. It was so hauled, and received by the defendant at Missouri Valley, there weighed by defendant, and shipped by defendant's agent to the defendant at Sioux City. Defendant's agent testifies that, after the fire, he went to plaintiff's place, and arranged to have the 435 pounds of wool which had been saved from the fire brought to Missouri Valley, and it was there weighed, and shipped to the defendant at Sioux City, and paid for at the contract price, but not at the time it was received and weighed. The 270 sheep were sheared on the 10th day of January, 1917, and 1,630 pounds of wool secured from the shearing. This was shipped by defendant to its place of business at Sioux City, and there received and paid for, but not at the time it was received. Therefore, of all the wool that plaintiff had at the time the contract was made, 2,048 pounds were shipped to the defendant, received by the defendant. and paid for by the defendant, as hereinafter more fully explained, after the fire occurred. All the wool received by defendant was paid for by the defendant at the contract price.

The controversy, therefore, is over the difference between the total amount of the wool, 4,613 pounds, and the

amount received by the defendant, 2,048 pounds, making a difference, represented by the burned wool, of 2,565 pounds; and it is to recover for this that plaintiff brings the action.

The real question presented by this record is: Who was the owner of this 2,565 pounds at the time it was burned? Had the title passed to the defendant, or was the title still in the plaintiff? Whose wool was burned?

If, under the arrangement and agreement between plaintiff and defendant, the title passed from the plaintiff to the defendant, and was in the defendant at the time of the fire, then defendant must sustain the loss. If the title had not passed from the plaintiff to the defendant at that time, and it was plaintiff's wool, then he must stand the loss. This question was tried to the jury. The jury returned a verdict for plaintiff for the amount claimed, or for the wool burned, on the theory that plaintiff had sold it to the defendant with the other wool, and that it was defendant's wool at the time it was burned. The only question submitted to the jury, and the only question that it was required to determine, is: Was there such a completed sale of the wool in question that the title to the wool in storage had passed to the defendant before the fire? If it did, it was defendant's wool, and defendant's loss.

Plaintiff's testimony tends to show that Joseph Strange, a member of defendant's firm, came to his house on or about the date named, and said that he had seen plaintiff's wool; that it was good wool; that he would like to buy it. Plaintiff said, "I will sell you the wool." Strange asked, "What do you want for it?" They agreed on 29½ cents. Strange said he would take it, and would furnish the sacks for it gratis. Strange asked how much wool plaintiff had in storage, and the plaintiff told him. Strange said:

" 'I will make settlement for 3,000 pounds, and if there is any more, you will get it.' He said he would weigh it at

Missouri Valley. He asked me if I would haul it to Missouri Valley. I told him I would. That was after he said he would take it, and would give me 29½ cents a pound. Thereupon, he wrote out and delivered to me the $25 check. He said, 'Will you haul it to Missouri Valley?' and I said, 'I will. You will get all the wool. It is yours. The wool is yours, even that on the sheep's back; but I cannot clip it until I get some man to clip it for me.' I said, 'When will you take it?' and he said, 'Next week, and I will ship the sacks right down.' He shipped the sacks, but he never came. I never received any word from him as to when he wanted the wool hauled to Missouri Valley, before it was burned. I was ready to bring in the wool at any time I received word from Mr. Strange to haul it in. I hadn't sacked the wool at the time of the fire. I was ready to sack it, but the reason I had not sacked it is that I was afraid something might destroy it,—pigs or something,— so I kept it cased up. I had it cased up nicely, so that nothing could get at it. At the time of the fire, it was all in the barn, in the place where it was when Strange bought it. After the fire, one of defendant's agents came down to my place, and we sacked the wool that was saved from the fire, amounting to 435 pounds, and hauled it in for them under the direction of this agent. He was at the farm, and directed that it be hauled in. It was hauled in. He was at Missouri Valley, and he had it weighed and shipped to Sioux City. It was weighed by this agent. It was not paid for at the time. I afterwards clipped the other sheep I called up Mr. Strange, and told him the wool was ready, and for him to come down. He said he could not come down, —they were busy; but said he would instruct the weighman of the Northwestern depot to weigh it correctly, and we should haul it in there. We hauled it in, and turned it over to the agent of the railway company. The first instructions I had to haul in any of the wool was after the fire. The 435

pounds saved from the fire, and the 1,630 pounds secured from the shearing were settled for and paid at the contract price. At the time I first talked with Strange, I told him I hadn't time to show him the wool. He said, 'I have looked at it with your son.' I think he said, the Saturday previous. He promised to take the wool that was in the barn away before the clipping was done. He said he would take that the next week. I didn't know how soon, and didn't tell him how soon the clipping would be done. He fixed no date when the wool was to be hauled in. After the shipments were all made, I came to Sioux City, and made a contract with Mr. Strange as to the payment for that which had already been received."

The contract was as follows:

"This agreement, made and entered into this 14th day of February, 1917, by and between M. S. Moats, of Missouri Valley, party of the first part, and Strange Brothers Hide Company, of Sioux City, Iowa, party of the second part, witnesseth:

"That whereas there is now pending between said parties a controversy relative to a certain sum due from the second party to the first party on account of wool sold to the second party by the first party, which was destroyed by fire; and,

"Whereas, there has been shipped by the first party to the second party a certain amount of wool aggregating 2,048 pounds, at the price of 29½ cents per pound; and

"Whereas, a certain amount of said wool has been delivered to the second party, for which there is due the first party 29½ cents per pound:

"It is hereby agreed, by and between the parties hereto, that the second party will, and does, upon the execution of this agreement, pay to the said first party the sum of six hundred and four dollars and sixteen cents ($604.16), said payment being made without prejudice to the rights of

the first party against the second party as to any claims he may have or allege to have against the second party on account of the wool destroyed by fire, as herein-above set forth, and without prejudice to any defense that the second party may have against said alleged claim.

"Executed in duplicate the day and year first above written.

"M. S. Moats, Party of the First Part.
"Strange Bros. Hide Co.,
"By Fred Strange, Treas., Party of the Second Part.
"Cash .......... $25.00
"Ck ........... 577.96
"Storage ........ 1.20
                 ‾‾‾‾‾‾‾‾
                 $604.16"

Defendant's testimony tends to show that, on the 14th of October, Mr. Strange went to plaintiff's home, looked over the wool, and looked over the sheep.

"On the 16th, went again, saw the plaintiff, and said, 'Are you ready to sell the wool?' Plaintiff said, 'No, not yet.' 'What is your reason?' 'It is not all sheared.' 'Well,' Mr. Strange said, 'sell me the wool that is sheared.' Plaintiff said, 'No, I don't want to sell anything until it is all sheared.' Mr. Strange said, 'What is your reason?' Plaintiff replied, 'I want to take all of the wool together, and make but one trip.' After a little talk, Strange said, 'How many sheep have you to shear?' Plaintiff stated the number. Strange said, 'When do you expect to shear?' Plaintiff said, 'Right away. I am waiting for the shearer now.' Strange then said, 'I will tell you what I will do. I will make a contract with you for all the wool, immediate delivery at Missouri Valley, at 29½ cents for the wool.' Plaintiff said, 'All right. Send me some sacks right away.' Strange said, 'When the lambs are sheared, I want the wool put right in the sacks, as soon as they are sheared. I want

the wool immediately. The market is strong.' Plaintiff said, 'All right, I will phone you when we shear.' When I was there, I looked at the lambs. I saw the wool the first day I went up there. I saw the lambs that hadn't been sheared both times."

Philip Sein, defendant's agent, who was with him at the time the sale was made, testified:

"We went to the barn and looked at the wool. Took samples back to Missouri Valley. Told the boy we would be back the next day. We drove out the next day."

He then detailed the conversation between the plaintiff and Strange substantially as Strange gave it, and then says:

"We never shipped full cars out of Missouri Valley, only local rates, not carloads. We shipped full cars out of Logan. I asked Mr. Moats whether he would rather haul his wool to Logan; that we intended to load a car there; that we would save money on freight: and he said it was too far, and I said, 'All right, haul it to Missouri Valley.' I was not out to the place again until after the fire. After the fire I was there. Plaintiff showed the damage, showed me what little wool they had saved. I said 'I will watch for you at the station, and any time you want to haul it in, I will weigh it up for you. I waited all day, and called him up three or four times, before he brought his wool down. That was after the fire. I weighed up the wool saved from the fire, and gave him a memorandum of the weight. I wanted to pay him for it right there, and he said to let it go until he got the rest of the sheep sheared and got pay in full. I weighed it up at the time I gave him the memorandum. When we were there on the 15th or 16th of October, we were there for the purpose of buying wool in and around Missouri Valley and Logan. We had business at numerous places around there, both before and after we were at plaintiff's, and bought quite a bit of wool,

—all that we knew of. We were anxious for the wool and all the wool that plaintiff had, and such other wool as we could get in the vicinity."

Plaintiff, on cross-examination, testified:

"I was to haul the wool to the station at Missouri Valley. It was to be weighed there and paid for when it was delivered there. Whenever I hauled it in, I was presumed to get my money."

The court instructed the jury that the only controversy between the parties in this action is as to the wool that was destroyed by fire, and instructed it that:

"If the plaintiff has proved that, at the time plaintiff and defendant had the negotiations with reference to said sale, it was the intention, understanding, and agreement of the parties that the defendant was not to become the owner of said wool, and was not to have the title thereto, until the same was delivered at the freight station at Missouri Valley, or if you find that the agreement between the parties was that the said wool was to be paid for upon delivery, and only upon delivery at Missouri Valley, then the plaintiff cannot recover. The fact, however, that plaintiff was to deliver said wool at Missouri Valley would not defeat his right of recovery, unless the delivery was to be made before title passed, and such was the understanding, agreement, and intention of the parties."

No objection is urged to any of the instructions.

It is the claim of the defendant that plaintiff was not entitled to recover, under the evidence and under the law as given to the jury by the court; that the evidence shows that it was not the understanding or agreement of the parties that the title should pass at once upon the making of the contract and the payment of the $25, but was dependent upon delivery at Missouri Valley; that there were two things which were essential to make a completed sale,— delivery at Missouri Valley and payment. These questions

were before the jury for their determination, and the deter-
mination was adverse, as is apparent, to defendant's claim.
We think there was a fair question for the jury, though
very close upon the facts.

It will be noted that the unclipped wool was clipped,
shipped to the defendant, received by the defendant, and
paid for by the defendant, without any controversy, and
long after the making of the contract,—days after the fire
occurred. It will be noted that, after the fire, the stored
wool was taken by the defendant's agent to Missouri Valley,
weighed, and shipped to defendant at Sioux City. The jury
could well find that, after the fire, defendant recognized the
contract, came to plaintiff's place, examined the wool that
remained, took it, had it shipped to Missouri Valley,
weighed, and from there shipped to the defendant at Sioux
City, without making any question at the time as to its lia-
bility for the burned wool. This could well be construed
by the jury into an admission that the wool belonged to
the defendant. The conduct of the parties subsequently is,
quite in keeping and harmony with the plaintiff's claim
that the wool in storage was purchased by the defendant, .
and a completed sale made of it, at the time the $25 was
paid; that nothing remained to be done but to ascertain the
quantity or quality; that all that was to be done was for
the plaintiff to haul it to Missouri Valley, whenever directed
to do so by the defendant. As to the wool in storage, noth-
ing was to be done between the parties in relation to the
thing sold. Nothing remained to be done between the buyer
and the seller, touching the property. So far as they were
concerned, the sale was completed. The seller agreed only
to haul it to Missouri Valley,—that is, the jury could well
find this,—whenever directed to do so by the defendant. It
is for the jury to determine, under these facts, whether there
was a completed sale or not. The title does not pass until
the sale is completed. As long as it remains executory, the

title does not pass. We are talking now only of the wool in storage. The other unclipped wool was delivered, accepted by the defendant, and paid for. As to this wool in storage, there was nothing to be done to put it in a condition for sale; nothing to be done to identify it; nothing to be done to discriminate it from other things. It was there—an entity—examined, samples taken, the price fixed, part of the price paid, with directions to the plaintiff to haul it in whenever the defendant should direct it to be hauled in. The claim of the plaintiff is that he had it ready for delivery; that he was ready to haul it in any time when directed to by the defendant; that he received no direction until after the fire; that, after the fire, he received directions to haul what was saved. It was hauled in, taken by the defendant, weighed, and shipped to the defendant at Sioux City. As said in *Allen v. Elmore,* 121 Iowa 241:

"The fact that weighing or measuring still becomes necessary to determine the price, will not indicate an intention that the title shall not pass until such acts are done; it being assumed, of course, for the purpose of applying this rule, that the specific goods are definitely ascertained and agreed upon."

Here, the wool was in existence. The number of pounds was ascertained and agreed upon. The price was agreed upon. Part of the price was paid. All that remained to be done was for the plaintiff to haul it in to Missouri Valley, when requested to do so by the defendant, and there the defendant agreed to have it weighed and shipped to itself at Sioux City.

In *Harris v. Beebe,* 144 Iowa 735, a case similar in its facts to the one before us, the court said:

"The record clearly shows that the potatoes were at the time of the sale in the bin; that they were inspected by defendant's agent; and that nothing was necessary, to complete the transaction, but delivery of the potatoes on

the track, and the ascertainment of the quantity contained in the bin in question. All the potatoes in that bin were sold to the defendant.   *   *   *   the jury was fully warranted in finding that there was, in fact, a completed sale of the potatoes at the time in question."

In *Welch v. Spies,* 103 Iowa 389, 392, this court said:

"But the title to property which is the subject of a contract of sale may pass at once, even though something remain to be done to ascertain and fix the rights of the parties,—as to weigh or measure the property sold. The intent of the parties is of controlling importance."

We think this case controls the rights of the parties in the instant suit. It is true that the actual manual delivery of the property and the payment of the purchase price places the situation more outside the pale of cavil and doubt than where there is not a manual delivery or payment of the purchase price in full; but these are not, under our present holdings, essential to passing of title. Though the thing remain in the possession of the seller, if it is in existence, the quantity is ascertained, and the price fixed, and a part of the purchase price paid, the fact that it is left in the possession of the seller, and the manual or physical delivery of the property postponed to a later date, or to a time designated by the buyer, will not take from it the character of a completed sale. What is done may or may not show a completed sale; but if what is done or said shows an intention on the part of the purchaser and seller to pass the title to the thing to the purchaser, immediately, the requirements of the law as to what is essential to a completed sale may be met, although the thing remains in the possession of the seller, and the actual physical delivery is, by agreement, postponed to a later date. Intention is an act of the mind. The intention of the parties is to be gathered from all that they said and did with relation to the passing of title, and the purchase and sale of the property. It is from

this that the jury must determine what the intention of the parties as to the passing of title was, at the time of the transaction. The sale is completed when everything is done that the seller is required to do, even though the seller retain possession, with an agreement, as in this case, that, when requested to do so by the buyer, he will make a manual or physical delivery of the property at a point designated by the defendant, or then agreed upon.

We think there was a fair question for the jury here; and whether their decision is right or wrong, it has support in the evidence, and we are bound by that finding. The case is, therefore,—*Affirmed.*

LADD, C. J., PRESTON and STEVENS, JJ., concur.